# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### ALEXANDRIA DIVISION

| | |
|---|---|
| **WILLIAM C. HUDDLESTON** | **CIVIL CASE NO. 22-2105** |
| **VERSUS** | **JUDGE EDWARDS** |
| **SHANNON CONSTANTINE, ET AL** | **MAG. JUDGE PEREZ-MONTES** |

## MEMORANDUM RULING AND ORDER

Before the Court are two motions for summary judgment. Matt Cloud ("Deputy Cloud"), Mark Baden ("Deputy Baden"), Billy Fuller ("Deputy Fuller"), and Mark Wood ("Sheriff Wood") (collectively, the "RPSO Defendants") filed the first Motion for Summary Judgment (R. Doc. 42). Shannon Constantine ("Officer Constantine"), the City of Alexandria (the "City"), the Alexandria Police Department (the "APD"), and Ronney Howard ("Chief Howard") (collectively, "APD Defendants") filed the second Motion for Summary Judgment (R. Doc. 44). Plaintiff, William Huddleston ("Huddleston"), opposes both motions (R. Docs. 55, 57). RPSO Defendants and APD Defendants (collectively referred to as "Defendants") replied to Huddleston's oppositions (R. Docs. 65, 67). Huddleston filed a sur-reply to the RPSO Defendants' reply (R. Doc. 70).

After consideration of the parties' memoranda and the applicable law, the Motions are **GRANTED**.

## I.   **BACKGROUND**

This case arises out of the alleged false arrest of Huddleston on July 14, 2021, when he was detained by Officer Constantine and Deputies Cloud, Baden, and Fuller. That morning, at 8:28 a.m., Officer Constantine was dispatched to investigate a carjacking.[1] Officer Constantine obtained a description of the vehicle and its license plate from the victim—a gray Honda Ridgeline with the license plate Y154496.[2] She was also told that one or more firearms were in the Ridgeline when it was stolen.[3] When Officer Constantine investigated the carjacking, she spoke to a witness who was a minor at the time of the incident.[4] The witness did not observe the carjacking.[5] The witness stated that "the only thing he saw was two black male subjects leaving in the Ridgeline."[6] Officer Constantine issued a "be on the lookout" ("BOLO") based on the information provided by the victim and that the suspects were considered armed and dangerous, but she did not include the description of the suspects from the minor witness because he was a minor and he did not witness the crime, only the escape.[7] Officer Constantine believed that the witness may have been mistaken, and that the suspects may have been "'wearing dark clothing' or been 'disguised,' 'wearing masks' while driving off."[8]

---

[1] *See* R. Doc. 57 at 11.
[2] *See* R. Doc. 42-1 at 18–19.
[3] *See* R. Doc. 42-1 at 19.
[4] *See* R. Doc. 57 at 11.
[5] *See* R. Doc. 55-3 at 40.
[6] *See* R. Doc. 55-3 at 40.
[7] *See* R. Doc. 55-3 at 87.
[8] *See* R. Doc. 44-1 at 37.

At 9:18 a.m., Officer Constantine contacted dispatch to inquire about a Nissan Altima that was spotted at the scene of the carjacking.[9] At 9:24 a.m., APD Dispatcher Alleuna Williams ("Dispatcher Williams") contacted the LaSalle Parish Sheriff's Office regarding the Nissan Altima and was informed that it was stolen from Ouachita Parish and involved in a hit and run in LaSalle Parish.[10] It was later confirmed to Dispatcher Williams that the Altima was stolen in Monroe, Louisiana, and it was believed that three escapees from a correctional facility for juveniles were the suspects.[11]

At 10:13 a.m., the stolen Honda Ridgeline was seen on Interstate Highway 49 South in Carencro, Louisiana.[12] A Detective from the Terrebonne Parish Sheriff's Office informed APD Sergeant Smith ("Sergeant Smith") of the sighting at 11:16 a.m., and based on the sighting, Sergeant Smith stated, "[t]hey're headed – they're probably headed to New Orleans."[13] Around 11:43 a.m., APD Dispatcher Rachael Martin ("Dispatcher Martin") updated Officer Constantine with the information that the stolen Honda Ridgeline had been spotted at 10:13 a.m.[14]

Prior to 12:19 p.m., Deputy Cloud stated he observed a Honda Ridgeline matching the description provided in the BOLO in the same area of the carjacking traveling westbound on Highway 28 West in Alexandria, Louisiana.[15] He was able to

---

[9] *See* R. Doc. 57 at 12.
[10] *See* R. Doc. 57 at 13.
[11] *See* R. Doc. 57 at 13–14.
[12] *See* R. Doc. 57 at 15.
[13] *See* R. Doc. 57 at 15.
[14] *See* R. Doc. 57 at 16.
[15] *See* R. Doc. 57

drive close enough to the Ridgeline to observe the license plate number.[16] Deputy Cloud entered the license plate into his in-car computer system to run the plate.[17] Deputy Cloud claims that after entering the license plate number from the Ridgeline, it came back as a license plate for a different vehicle (i.e., switched tags).[18] However, data from his in-car computer system shows that at 12:14 p.m., he made a license plate inquiry using license plate number X120145, which is the license plate for Huddleston's Ridgeline.[19] Huddleston's Ridgeline turned off Highway 28 West and parked at his son's office.

At 12:19 p.m., Deputy Cloud called APD's dispatcher and stated that he had spotted a Ridgeline matching the description of the BOLO that appeared to have switched tags on it.[20] Deputies Fuller and Baden heard this call and travelled to Deputy Cloud's location.[21] Around 12:22, Officer Constantine was contacted by APD dispatch regarding a Honda Ridgeline with allegedly switched tags, so she drove to the Ridgeline's location and parked behind it.[22] Because the Ridgeline was reported to have firearms in it, and the suspect could get out shooting, Officer Constantine did not take the time to call in or run the license plate number.[23]

Once Officer Constantine and Deputies Fuller, Baden, and Cloud were all at the scene, Deputy Fuller directed Huddleston to step out of the vehicle and walk

---

[16] *See* R. Doc. 57 at 16.
[17] *See* R. Doc. 57 at 16.
[18] *See* R. Doc. 42-1 at 13.
[19] *See* R. Doc. 57 at 16.
[20] *See* R. Doc. 57 at 18.
[21] *See* R. Doc. 57 at 18.
[22] *See* R. Doc. 57 at 18.
[23] *See* R. Doc. 42-1 at 19.

towards them with his hands up, which commands Huddleston disobeyed.[24] According to Officer Constantine, "[h]e was not obeying the commands given. He was told to put his hands up. He was being very argumentative with us."[25] Officer Constantine briefly drew her gun and pointed it at the ground before putting it back in her holster.[26] They thought Huddleston could be armed, so in attempt to make sure everyone was safe, they attempted to handcuff Huddleston.[27] While Officer Constantine and Deputy Fuller were attempting to handcuff Huddleston, he tensed and moved his arms which caused Huddleston's hand to hit Officer Constantine's chest-mounted bodycam.[28] Officer Constantine and Deputy Fuller "double cuffed" Huddleston, meaning two sets of handcuffs were used instead of one, to prevent stress on Huddleston's shoulders and chest.[29] While handcuffing Huddleston, Officer Constantine touched his waistband and found no weapons.[30] She also began reading him his *Miranda* rights, but stopped before she finished.[31]

After Huddleston was handcuffed, Officer Constantine requested that the vehicle not be touched because she was unsure if it was the stolen Honda Ridgeline.[32] She was concerned that it was a potential crime scene from the carjacking.[33] Nevertheless, when she relayed the VIN of Huddleston's Ridgeline to APD dispatch,

---

[24] *See* R. Doc. 42-1 at 19.
[25] *See* R. Doc. 44-1 at 20.
[26] *See* Shannon Constantine Body Worn Camera Footage at 00:30–00:45; *see also* R. Doc. 67 at 21.
[27] *See* R. Doc. 44-1 at 20.
[28] *See* R. Doc. 42-1 at 20.
[29] *See* R. Doc. 44-1 at 20–21.
[30] *See* R. Doc. 42-1 at 21.
[31] *See* R. Doc. 57 at 20.
[32] *See* R. Doc. 44-1 at 21.
[33] *See* R. Doc. 44-1 at 21.

she was advised that it was not the stolen vehicle from earlier that morning.[34] After approximately four-to-five minutes, Huddleston was released.[35] Since the incident, Huddleston has been treated for shoulder injuries and has sought counseling for mental anguish and anxiety.[36]

On July 14, 2022, Huddleston filed suit against the RPSO Defendants, the APD Defendants, and the Rapides Parish Police Jury.[37] Pursuant to 42 U.S.C. § 1983, Huddleston asserts violations of the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution. He alleges that he was falsely arrested without probable cause, excessive force was used during the arrest, he was not informed of the nature and cause of the allegations against him when he was arrested, he was deprived of liberty without due process of law, and he was deprived of equal protection of the laws. Huddleston also asserts state law claims of excessive force, assault, battery, false arrest, false imprisonment, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence against Defendants.

## II.   **LEGAL STANDARD**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[38] A material fact impacts the outcome of a lawsuit and can be identified through substantive law.[39] A dispute about a material fact is genuine "if

---

[34] *See* R. Doc. 44-1 at 21.
[35] *See* R. Doc. 44-1 at 21.
[36] *See* R. Doc. 55 at 44–49.
[37] *See* R. Doc. 1. Huddleston voluntarily dismissed his claims against the Rapides Parish Police Jury before the instant motions were filed. *See* R. Doc. 6.
[38] Fed. R. Civ. P. 56(a).
[39] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

the evidence is such that a reasonable jury could render a verdict for the nonmoving party."[40] "[A] party asserting that a fact cannot be or is genuinely disputed must support the motion by citing to particular parts of materials in the record."[41]

In a summary judgment motion, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings ... [and] affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[42] If the movant meets this initial burden, then the non-movant has the burden of going beyond the pleadings and designating specific facts that prove that a genuine issue of material fact exists.[43] A non-movant, however, cannot meet the burden of proving that a genuine issue of material fact exists by providing only "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[44] Similarly, "unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment."[45]

In reviewing the evidence, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."[46] The district court will not "evaluate the credibility of the

---

[40] *Id.*
[41] Fed. R. Civ. P. 56(c)(1)(A).
[42] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations and citations omitted).
[43] *Id.* at 324.
[44] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[45] *Clark v. Am's Favorite Chicken*, 110 F.3d 295, 297 (5th Cir. 1997).
[46] *Reeves v. Sanderson Plumbing Products Inc.*, 530 U.S. 133, 150 (2000).

witnesses, weigh the evidence, or resolve factual disputes."[47] Factual controversies are to be resolved in favor of the nonmovant, "but only when … both parties have submitted evidence of contradictory facts."[48]

## III.    **EVIDENTIARY CHALLENGE**

### a. *Kologik Printout*

The RPSO Defendants object to Huddleston's Exhibit 6 (R. Doc. 57-9 at 1–6), which is a letter from defense counsel to Huddleston's counsel accompanied by the following: (1) Security Agreement between Kologik (a software company) and the Rapides Parish Sheriff (R. Doc. 57-9 at 3); (2) LLETS Offline Search Request Form (R. Doc. 57-9 at 4); Kologik printout containing Deputy Cloud's Usage Report 7/10/21-7/17/21 (R. Doc. 57-9 at 6); and Excerpt from Responses to Interrogatories (R. Doc. 57-10).[49]

The RPSO Defendants assert that the exhibit is not competent summary judgment evidence because it includes hearsay, hearsay within hearsay, is not relevant, and lacks a proper foundation.[50] First, they argue that "this piece of paper is hearsay as it is an out of court statement submitted for the truth of the matter asserted."[51] In addition, they argue that the information contained within the paper is also hearsay.[52] Further, the RPSO Defendants contend that Huddleston's interpretation of the entries he cited is nothing more than his attorney's

---

[47] *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991) (citations omitted).
[48] *Little*, 37 F.3d at 1075.
[49] *See* R. Doc. 65 at 6.
[50] *See* R. Doc. 65 at 6.
[51] *See* R. Doc. 65 at 7.
[52] *See* R. Doc. 65 at 7.

speculation.[53] Finally, the RPSO Defendants argue that during discovery, Huddleston had the opportunity to depose Kologik to determine the how, when, and where of the information contained therein.[54] According to the RPSO Defendants, it was up to Huddleston's attorney to explore whether the documents could be made admissible and that no attempt was made to lay the foundation to allow for the admissibility of the pages.[55]

The Court finds that Huddleston's Exhibit 6 is competent summary judgment evidence. First, the Court finds that the license plate search history logs of Deputy Cloud do not constitute "statements" under Rule 801(a).[56] Second, the inquiries made by Deputy Cloud, evidenced through the search logs, do not constitute hearsay because they are questions, and questions are not "statements" under Rule 801(a).[57] Next, even if the license plate search history logs were found to be "statements," they would not be hearsay because the license plate search history logs are statements by a party opponent pursuant to the contract between the RPSO and Kologik under FRE 801(d)(2)(C) & (D). And finally, even if the license plate search history logs were found to be hearsay, they can be considered under the business record exception in FRE 803(6).

---

[53] *See* R. Doc. 65 at 7.
[54] *See* R. Doc. 65 at 7.
[55] *See* R. Doc. 65 at 8.
[56] *United States v. Diggs*, No. 18 CR 185, 2020 WL 5878018, at *4 (N.D. Ill. Oct. 2, 2020), *aff'd*, 81 F.4th 755 (7th Cir. 2023) ("The phone call logs and web search history plainly are not 'statements' under Rule 801(a), so they are not hearsay.").
[57] *Cross Trailers, Inc. v. Cross Trailer Mfg. & Sales, LLC*, 363 F. Supp. 3d 774, 786 (W.D. Tex. 2018) ("Questions and inquiries are not hearsay because they do not, and are not intended to, assert anything.") (cleaned up).

Moreover, "[a]t the summary judgment stage, materials cited in support or dispute a fact need only be capable of being 'presented in a form that would be admissible in evidence.'"[58] Here, Huddleston has not laid the proper foundation for the exhibit, but *he can do so at trial*. Accordingly, the exhibit is admissible.

## IV. ANALYSIS

### a. Improper Defendants

Huddleston has named as defendants the Rapides Parish Sheriff's Office[59] and the Alexandria Police Department. The RPSO and APD, however, are not proper defendants, and summary judgment is granted as to any claims against them.

Pursuant to Federal Rule of Civil Procedure 17(b) the capacity to sue or be sued is determined "by the law of the state where the Court is located." To possess such a capacity under Louisiana law, an entity must qualify as a "juridical person."[60] In Louisiana, "a sheriff's office is not a legal entity capable of being sued…."[61] The same is true of a city police department, because "city police departments in Louisiana lack juridical capacity."[62]

Because the RPSO and APD are not capable of being sued, they are not proper parties and summary judgment must be granted for the claims against them.

---

[58] *Moore v. LaSalle Corrections, Inc.*, No. 3:16-CV-01007, 2020 WL 6389183, at *3 (W.D. La. Oct. 30, 2020)

[59] In his Complaint, Huddleston uses "Rapides Parish Sheriff's Office" and "Rapides Parish Sheriff's Department" interchangeably. The Court will hereinafter refer to it as the "RPSO."

[60] *Dugas v. City of Breaux Bridge Police Dep't*, 757 So.2d 741, 743 (La. App. 3 Cir. 2/2/2000).

[61] *Cozzo v. Tangipahoa Parish Council-President Government*, 279 F.3d 273, 283 (5th Cir. 2002).

[62] *Williams v. Houma Police Dep't*, No. CV 20-0040, 2020 WL 4808651, at *4 (E.D. La. July 14, 2020), *report and recommendation adopted*, 2020 WL 4785079 (E.D. La. Aug. 18, 2020).

### b. *Fourteenth Amendment Claims*

#### i. **Equal Protection**

In his Complaint, Huddleston claims that all Defendants deprived him of "the right to equal protection of the laws, secured by the Fourteenth Amendment to the Constitution."[63] In the Complaint, however, Huddleston makes no effort to properly plead his equal protection claim, and instead, relies on the one conclusory allegation.[64] Further, Huddleston makes no argument whatsoever as to who, when, or how Defendants deprived him of his equal protection rights. Accordingly, Defendants' motions for summary judgment on Huddleston's equal protection claims are granted.

#### ii. **Due Process**

Huddleston also claims that all Defendants deprived him of his "right to not be deprived of life, liberty, or property without due process of law …."[65] "A plaintiff may bring a substantive due process claim under the Fourteenth Amendment only if the claim alleged is not susceptible to proper analysis under a specific constitutional source."[66] Here, the Fourth Amendment provides an explicit textual source for all of

---

[63] *See* R. Doc. 1, ¶ IV-1-C.
[64] *See Hines v. Quillivan*, 982 F.3d 266, 272 (5th Cir. 2020) ("To state a claim for equal protection, the plaintiff must prove that similarly situated individuals were treated differently.") (internal quotation marks and citations omitted).
[65] *See* R. Doc. 1, ¶ IV-1-C.
[66] *Warren v. Talley*, No. CV 21-0133, 2022 WL 2359787, at *4 (W.D. La. June 29, 2022) (citing *Petta v. Rivera*, 143 F.3d 895, 901 (5th Cir. 1998)); *see also Graham v. Connor*, 490 U.S. 386, 395 (1989) ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.").

Huddleston's false arrest and excessive force claims.[67] Substantive due process is not the guide for Huddleston's claims.[68]

Thus, to the extent that Huddleston asserts false arrest and excessive force claims under the Fourteenth Amendment, Defendants' motions for summary judgment on Huddleston's substantive due process claims are granted. However, Huddleston's false arrest and excessive force claims under the Fourth Amendment will be discussed below.

### c. *Fourth Amendment Claims*

#### i. Section 1983 Claims Against Deputies Cloud, Baden, and Fuller and Officer Constantine

42 U.S.C. § 1983 provides a federal cause of action for the "deprivation of any rights, privileges or immunities secured by the Constitution and laws" against any person acting under color of state law. Section 1983 does not itself create substantive rights; rather, it merely provides remedies for rights guaranteed to citizens by the United States Constitution or other federal laws.[69] For example, § 1983 is used in vindicating rights conferred by the Fourth Amendment, as Huddleston seeks to do in the instant case.[70]

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established

---

[67] *See Graham*, 490 U.S. at 395.

[68] *Id*.

[69] *See id*. at 393–94; *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985).

[70] *See, e.g, Thompson v. Clark*, 596 U.S. 36, 39 (2022); U.S. CONST. amend. IV.

statutory or constitutional rights of which a reasonable person would have known.'"[71] Accordingly, "officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"[72] The two steps of the qualified immunity inquiry may be performed in any order.[73]

The qualified immunity doctrine turns the traditional summary judgment burden on its head, requiring a plaintiff—the non-moving party—to "demonstrate the inapplicability of the defense."[74] To meet this burden, the plaintiff must "(1) raise a fact dispute on whether his constitutional rights were violated by the defendants' individual conduct, and (2) show those rights were 'clearly established at the time of the violation.'"[75] "This is a demanding standard."[76] "Because qualified immunity protects all but the plainly incompetent or those who knowingly violate the law, we do not deny its protection unless existing precedent places the constitutional question beyond debate."[77] However, even when conducting a qualified immunity analysis, the Court views all evidence and makes all reasonable inferences in the light most favorable to the plaintiff.[78]

---

[71] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).
[72] *D.C. v. Wesby*, 583 U.S. 48, 62–63 (2018) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).
[73] *Pearson*, 555 U.S. at 236.
[74] *Rogers v. Jarrett*, 63 F.4th 971, 975 (5th Cir. 2023).
[75] *Id.*
[76] *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015), *cert. denied*, 578 U.S. 907 (2016).
[77] *Argueta v. Jaradi*, 86 F.4th 1084, 1088 (5th Cir. 2023), *cert. denied*, 145 S.Ct. 435 (2024) (internal quotation marks and citations omitted).
[78] *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

1. *Investigative Detention vs. False Arrest*

As a preliminary matter, the parties differ in their description of the seizure that occurred in this case. Both the RPSO and APD Defendants characterize the detention as a *Terry* stop, while Huddleston characterizes the detention as a false arrest.

"The Fourth Amendment guarantees individuals the right to be 'secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'"[79] "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."[80] Even where an individual did not attempt to leave, circumstances that possibly indicate a seizure include: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."[81]

"A seizure rises to the level of an arrest only if 'a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.'"[82] An "arrest" requires probable cause.[83] The "reasonable person" for these purposes is one "neither guilty of criminal conduct and thus overly apprehensive nor insensitive

---

[79] *United States v. Massi*, 761 F.3d 512, 520 (5th Cir. 2014) (quoting U.S. CONST. amend. IV).
[80] *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (footnote omitted).
[81] *Id.*
[82] *Turner v. Lieutenant Driver*, 848 F.3d 678, 692–93 (5th Cir. 2017) (quoting *Carroll v. Ellington*, 800 F.3d 154, 170 (5th Cir. 2015)).
[83] *Freeman v. Gore*, 483 F.3d 404, 413 (5th Cir. 2007).

to the seriousness of the circumstances."[84] A person, however, may be physically restrained by law enforcement without that custody being considered an arrest for constitutional purposes. "The police are allowed to stop and briefly detain persons for investigative purposes if the police have a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'"[85]

When determining whether an investigative stop amounts to an arrest, "[t]he relevant inquiry is always one of reasonableness under the circumstances," which must be considered on a case-by-case basis.[86] "[U]sing some force on a suspect, pointing a weapon at a suspect, ordering a suspect to lie on the ground, and handcuffing a suspect—whether singly or in combination—do not automatically convert an investigatory detention into an arrest requiring probable cause."[87] Moreover, immediately advising a suspect of their *Miranda* rights does not amount to a de facto arrest.[88]

Huddleston argues that a reasonable person in his position would believe that an arrest occurred.[89] He asserts that he "was in shock" during the encounter, saw multiple officers approaching him from all sides with their guns pointed at him, he was never informed of the situation, he was handcuffed, and had his *Miranda* rights

---

[84] *United States v. Corral-Franco*, 848 F.2d 536, 540 (5th Cir. 1988).
[85] *United States v. Lewis*, 208 F. App'x 298, 300 (5th Cir. 2006) (per curiam) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).
[86] *United States v. Sanders*, 994 F.2d 200, 206–07 (5th Cir. 1993).
[87] *Id.* at 206.
[88] *United States v. Davis*, No. CR 06-60-JJB, 2006 WL 8439459, at *4 (M.D. La. Dec. 4, 2006), *aff'd*, 330 F. App'x 469 (5th Cir. 2009)
[89] *See* R. Doc. 57 at 25.

read to him.[90] He further claims that he did not have the ability to move, go anywhere, or do anything.[91]

Defendants argue that the situation was a *Terry* stop. Defendants contend that Huddleston was only detained for roughly four-to-five minutes, and the facts do not give rise to an arrest.[92] Further, the APD Defendants contend that although Huddleston stated that Officer Constantine raised her firearm at him as he approached,[93] Officer Constantine's body camera footage contradicts Huddleston's testimony and shows that she only pointed the gun to the ground and quickly put it back in her holster.[94] As such, Defendants contend that the "totality of these circumstances do not 'constitute a restraint on freedom of movement to the degree which law associates with a formal arrest,' and accordingly, the stop never progressed to a formal arrest."[95] Defendants are correct.

In *Smith v. Heap*, the Fifth Circuit found similar circumstances to constitute an investigatory stop.[96] In *Smith* the plaintiff alleged that the "deputies aimed guns at him, 'activated the sirens and flashers on their vehicles, commanded [him] to exit his vehicle, handcuffed [him], and tried to place [him] into the back of a squad car.'"[97] In determining that the plaintiff did not adequately plead an unreasonable seizure, the court reasoned that "those measures typify our cases dismissing claims of *de facto*

---

[90] *See* R. Doc. 57 at 25–26.
[91] *See* R. Doc. 57 at 26.
[92] *See* R. Doc. 65 at 17; *see also* R. Doc. 67 at 21–22.
[93] *See* R. Doc. 55 at 25.
[94] *See* Shannon Constantine Body Worn Camera Footage at 00:30–00:45; *see also* R. Doc. 67 at 21.
[95] *See* R. Doc. 65 at 17.
[96] 31 F.4th 905 (5th Cir. 2022).
[97] *Id.* at 911.

arrest."[98] The court also noted that the officers detained the plaintiff for mere minutes and released him after he denied aiming his gun at another driver.[99]

Based on the parties' arguments and the applicable Fifth Circuit case law, the Court finds that the seizure in this case was an investigative detention under *Terry*, and not an arrest. Now that it has determined that the stop and detention do not amount to an arrest, the Court will analyze Huddleston's unlawful seizure and detention claims under the framework from *Terry* and its progeny.

## 2. *Unlawful Seizure Against Deputy Cloud*

It is well settled that "police officers may stop and briefly detain an individual for investigative purposes if they have reasonable suspicion that criminal activity is afoot."[100] To meet the "reasonable suspicion" standard, an officer must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'"[101] An investigatory detention (1) must be "justified at its inception" and (2) "the officer's subsequent actions must be reasonably related in scope to the circumstances that justified the stop."[102] The first prong requires a court to determine "whether, under the totality of the circumstances, the officers had reasonable suspicion to stop [the plaintiff] ...."[103] Reasonable suspicion is a "low threshold[,]" one

---

[98] *Id.*
[99] *Id.*
[100] *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000).
[101] *Terry*, 392 U.S. at 27.
[102] *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (citing *Terry*, 392 U.S. at 19–20).
[103] *United States v. Darrell*, 945 F.3d 929, 932 (5th Cir. 2019) (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

that "exists when the officer can point to specific and articulable facts which, taken together with rational inferences … reasonably warrant the search and seizure."[104]

Deputy Cloud contends that the BOLO from the APD provides the basis for his reasonable suspicion to stop and detain Huddleston.[105] "[A]n alert of BOLO report may provide the reasonable suspicion necessary to justify an investigative stop."[106] "Whether a particular tip or BOLO report provides a sufficient basis for an investigatory stop depends upon a number of factors, including the credibility or reliability of the source of the information set forth in the BOLO, the specificity of the information contained in the BOLO, the extent to which the information in the report can be verified by officers in the field, and whether the report concerns active or recent activity, or has instead gone stale."[107] These factors are commonly referred to as the *Gonzalez* factors.[108]

In this case, the information used to describe the stolen Honda Ridgeline—including the color and license plate number—came from the victim of the carjacking. The information contained in the BOLO did not contain the age or race of the suspects, but did include specific information regarding the make, model, color, and license plate of the stolen vehicle—all verifiable by officers in the field. "[T]he Fourth Amendment does not require that a BOLO specifically include a vehicle's license plate

---

[104] *United States v. Walker*, 49 F.4th 903, 907 (5th Cir. 2022) (quoting *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005)).

[105] *See* R. Doc. 42-1 at 27.

[106] *United States v. Rodriguez*, 564 F.3d 735, 742 (5th Cir. 2009) (citing *United States v. Gonzalez*, 190 F.3d 668 (5th Cir. 1999)).

[107] *United States v. Reed*, No. 6:15-CR-00113, 2015 WL 10739299, at *7 (W.D. La. Dec. 28, 2015), *report and recommendation adopted*, 2016 WL 1704402 (W.D. La. Apr. 26, 2016), *report and recommendation adopted*, 187 F. Supp. 3d 743 (W.D. La. 2016) (citing *Gonzalez*, 190 F.3d at 672).

[108] *See Gonzalez*, 190 F.3d 668.

number or registration information."[109] Finally, the BOLO had not gone stale because it concerned a carjacking that had occurred roughly four hours earlier. The Court is satisfied that the four *Gonzalez* factors have been met.[110] Accordingly, the Court finds that the information regarding the gray Honda Ridgeline that was provided to APD by the victim of the carjacking gave Deputy Cloud the reasonable suspicion to conduct a *Terry* stop of Huddleston's vehicle.[111]

Huddleston alleges that Deputy Cloud did not have any reasonable suspicion to stop the vehicle and detain him because the 12:14 p.m. license plate search dispelled all belief of any criminal activity.[112] According to Huddleston, the "search history of [Deputy] Cloud clearly confirms that Mr. Huddleston was the registered owner of the vehicle with license plate number X120145."[113] Huddleston is correct that the search history does confirm that Huddleston was indeed the owner of the vehicle with the license plate number X120145. However, Huddleston is incorrect that the search history "dispelled any reasonable suspicion" to stop the vehicle because the search history relied on by Huddleston does not provide the make, model, or color of the vehicle searched. In fact, after reviewing the search history, the Court cannot discern any information other than the license plate number ran by Deputy Cloud and Huddleston's information including his name, race, and sex. Any assertion

---

[109] *Rodriguez*, 564 F.3d at 742.

[110] *See Gonzalez*, 190 F.3d at 672.

[111] *Benfer v. City of Baytown, Texas*, No. 4:22-CV-2196, 2023 WL 6465870, at *7 (S.D. Tex. Oct. 4, 2023), *aff'd*, 120 F.4th 1272 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 1313 (2025) ("Given that Officer Calvert had reasonable suspicion based upon the BOLO report that Plaintiff was committing an offense by potentially driving a stolen vehicle, the Court finds that he had reasonable suspicion to justify an investigatory stop.").

[112] *See* R. Doc. 57 at 45.

[113] *See* R. Doc. 57 at 45.

19

to the contrary by Huddleston would be nothing more than a guess on his part.[114] Further, based on the information in the BOLO, Deputy Cloud did not have any description of the suspect(s) in the carjacking. In viewing the facts in the light most favorable to Huddleston, the Court finds Deputy Cloud was justified in making the stop, and that he had the requisite reasonable suspicion to conduct the stop.

Since the Court finds that the first prong is met, the Court now moves to the second prong which considers whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop.[115]

The Court finds that this prong is met. When the stop occurred, Deputy Fuller ordered Huddleston to step out of the vehicle and placed him in handcuffs with Officer Constantine while it was confirmed whether the vehicle was the one stolen. The whole process took roughly five minutes.[116] The actions of Officer Constantine and Deputies Fuller, Baden, and Cloud were taken in response to the possibility that the driver of the vehicle could have been the armed and dangerous suspect from the earlier violent carjacking.

And even if Deputy Cloud lacked reasonable suspicion to stop Huddleston, to defeat Deputy Cloud's qualified immunity defense, Huddleston must identify a case where a court, on similar facts, found that reasonable suspicion did not exist.[117] He did not. Thus, because the Court finds that there was no constitutional violation, and

---

[114] *See Williams v. BP Expl. & Prod., Inc.*, 143 F.4th 593, 602 (5th Cir. 2025) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment.") (citations omitted).
[115] *Brigham*, 382 F.3d 500, 506 (citing *Terry*, 392 U.S. at 19–20).
[116] *See* Shannon Constantine Body Worn Camera Footage at 00:00–04:28.
[117] *See Wesby*, 583 U.S. at 63–64.

Huddleston did not make the requisite showing that the stop violated a clearly established right, Deputy Cloud is entitled to qualified immunity. Accordingly, summary judgment on Huddleston's unlawful seizure claim against Deputy Cloud is granted.

### 3.  *Unlawful Detention Against Officer Constantine*

Huddleston alleges an unlawful detention claim against Officer Constantine. He claims that Officer Constantine could not have a reasonable suspicion to detain Huddleston because she had information that the suspects in the carjacking were two African American males, and the stolen vehicle was allegedly spotted in Carencro, Louisiana.[118]

First, the description of the suspects. When Officer Constantine investigated the carjacking, she spoke to a witness who was a minor at the time of the incident. The witness did not observe the carjacking.[119] The witness stated that "the only thing he saw was two black male subjects leaving in the Ridgeline."[120] Officer Constantine stated the witness "did not observe [the victim] getting battered. He did not observe anything like that. … He heard a commotion, he went outside and he saw them leaving."[121] Officer Constantine did not include the witness's description of the suspects in the BOLO because he was a minor and he did not witness the crime, only the escape.[122] Officer Constantine believed that the witness may have been mistaken,

---

[118] *See* R. Doc. 55 at 36–40.
[119] *See* R. Doc. 55-3 at 40.
[120] *See* R. Doc. 55-3 at 40.
[121] *See* R. Doc. 55-3 at 40.
[122] *See* R. Doc. 55-3 at 87.

and that the suspects may have been "'wearing dark clothing' or been 'disguised,' or 'wearing masks' while driving off."[123] Huddleston contends that failing to include the description of the suspects in the BOLO was improper and that Officer Constantine's beliefs contradicted the witness's statements and based on pure speculation unsupported by any articulable fact.[124]

When considering a BOLO, an officer must consider the credibility and reliability of an informant, the specificity of the information, and the extent to which the information can be verified.[125] The physical description of the suspect "may be of little use when the offender is traveling by car," in which case the suspicion turns largely on the description police have of the vehicle.[126] Here, Officer Constantine was able to verify the description of the vehicle, its license plate, and that the suspect(s) may be armed and dangerous. She was unable to verify the race of the suspects because the only witness was a minor who only briefly saw the suspects drive away. Courts must allow law enforcement officers "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."[127] It is entirely reasonable for Officer Constantine—based on her experience and specialized training—not to contain a description of the suspects in the BOLO because *it could*

---

[123] *See* R. Doc. 44-1 at 37.
[124] *See* R. Doc. 55 at 37–38.
[125] *Gonzalez*, 190 F.3d at 672.
[126] 4 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 9.5(h)(1) (6th ed. 2020).
[127] *Arvizu*, 534 U.S. at 273.

*have been wrong.*[128] What was *not* wrong, however, was the make, model, color, and license plate of the stolen vehicle that *was* included in the BOLO.

Next, Huddleston claims that Officer Constantine did not have reasonable suspicion to detain him because she had information that the stolen Ridgeline was spotted in Carencro, which is 82.5 miles south of Alexandria.[129] He contends that during the course of investigating the carjacking, Officer Constantine had information from APD dispatchers and other officers that the carjacking suspects were three male juvenile suspects who had escaped from a correctional facility for juveniles located in Monroe, Louisiana.[130] The juveniles had allegedly stolen a Nissan Altima in Ouachita Parish and been involved in a hit and run in LaSalle Parish before stealing the Ridgeline in Alexandria and being spotted in Carencro, Louisiana.[131] Huddleston claims that Officer Constantine knew that the stolen Ridgeline was no longer in the area because Dispatcher Martin had informed her that the Lafayette Parish Sheriff's Office spotted the Ridgeline on a camera at 10:15 a.m.[132] Because of this, Huddleston argues that Officer "Constantine's suggestion that it was unknown who committed the crime is contrary to logic and reason."[133]

Officer Constantine argues that she was not informed that the stolen Ridgeline was possibly in Carencro earlier that morning when she had detained Huddleston.[134]

---

[128] *United States v. Wade*, 388 U.S. 218, 228 (1967) ("The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification.").
[129] *See* R. Doc. 55 at 39.
[130] *See* R. Doc. 55 at 38.
[131] *See* R. Doc. 55 at 38.
[132] *See* R. Doc. 55 at 14–15; *see also* R. Doc. 55-3 at 151–152.
[133] *See* R. Doc. 55 at 38.
[134] *See* R. Doc. 67 at 6; *see also* R. Doc. 55-3 at 89.

Further, although Dispatcher Martin said she conveyed the information to Officer Constantine, she later stated that she could not remember if she advised Constantine because it was over three years ago at the time of her deposition.[135]

Dispatcher Williams made it clear that the stolen Ridgeline was "still missing or stolen" and since it was "a moving vehicle—it could've been traveling anywhere."[136] Even if Dispatcher Martin had conveyed the information to Officer Constantine, the stolen Ridgeline was spotted on the camera *two hours* before Deputy Cloud spotted Huddleston; this is more than enough time for the Ridgeline to make it back to Alexandria.[137] And although Deputy Cloud's report that Huddleston's vehicle had switched tags was ultimately incorrect, Officer Constantine could rely on the information that the suspected stolen vehicle had been spotted in the area of the carjacking with switched plates.

Once at the scene, Officer Constantine was not constitutionally required to postpone the detention of Huddleston until it was confirmed that he was a suspect in the carjacking.[138] Courts have routinely dismissed Fourth Amendment challenges to investigative detentions in which the police failed to confirm the physical description of the suspect or the vehicle prior to the stop and therefore mistakenly detained the wrong person.[139]

---

[135] *See* R. Doc. 55-5 at 170.

[136] *See* R. Doc. 44-6 at 6.

[137] *Scott v. Harris*, 550 U.S. 372, 374 (2007) (An "opponent must do more than simply show that there is some metaphysical doubt as to the material facts.").

[138] *See Armijo v. Peterson*, 601 F.3d 1065, 1072 (10th Cir. 2010) (As long as police officers act reasonably, they "need not exhaust every avenue of dispelling suspicion" prior to detaining a suspect.).

[139] *See United States v. Webster*, 314 F. Appx. 226, 229 (11th Cir. 2008) ("Although it might have been better for Officer Manora to call in to confirm the BOLO before stopping Webster, we cannot say that it was unreasonable for him not to do so."); *United States v. Shareef*, 100 F.3d 1491, 1505-1506 (10th

Taking the facts in the light most favorable to Huddleston, Huddleston has failed to show that Officer Constantine did not have a reasonable suspicion to briefly detain him during the stop. He has further failed to identify for the Court a case where, on similar facts, another court found that reasonable suspicion did not exist. Thus, because the Court finds that there was no constitutional violation, and Huddleston did not make the requisite showing that the detention violated a clearly established right, Officer Constantine is entitled to qualified immunity. Accordingly, summary judgment on the claim is granted.

4. *Unlawful Detention Against Deputy Fuller and Deputy Baden*

As to Deputy Fuller, Huddleston alleges that he directed Huddleston to step out of the vehicle and assisted Officer Constantine in placing Huddleston in handcuffs.[140] As to Deputy Baden, Huddleston alleges that he directly participated in the detention by being present as a show of force, investigating the vehicle, and maintaining control over Huddleston while the other Defendants cleared the vehicle.[141]

To the extent that Deputy Fuller could be subject to potential liability under § 1983, he is protected from liability under the collective knowledge doctrine. An officer is shielded from liability in cases "where the arresting officer has no personal knowledge of any of the facts establishing probable cause, but simply carries out

---

Cir. 1996) (finding that an officer did not behave "unreasonably in failing to confirm the physical description of the suspect" prior to the stop).

[140] *See* R. Doc. 57 at 40–41.

[141] *See* R. Doc. 57 at 42–43.

directions to arrest given by another officer who does have probable cause."[142] Here, the Court has already established that Deputy Cloud had reasonable suspicion to initiate the stop and Officer Constantine had reasonable suspicion to detain Huddleston. As such, even though Deputy Fuller would have reasonable suspicion on his own to place Huddleston in handcuffs, he could rely on the "collective knowledge" of Deputy Cloud and Officer Constantine to establish his reasonable suspicion for detention. The same goes for Deputy Baden, who did not actually participate in handcuffing Huddleston. As such, summary judgment is granted as to these claims against Deputies Fuller and Baden.

5. *Excessive Force by Officer Constantine and Deputy Fuller*

"To be liable under § 1983, [an officer] must have been personally involved in the alleged constitutional deprivation or have engaged in wrongful conduct that is causally connected to the constitutional violation."[143] Although Huddleston lodges excessive force claims against Deputies Fuller, Baden, Cloud, and Officer Constantine, only Officer Constantine and Deputy Fuller engaged in the alleged wrongful conduct. Thus, only the claims against Officer Constantine and Deputy Fuller are capable of review, and summary judgment is granted as to the others.

The Fourth Amendment creates a "right to be free from excessive force during a seizure."[144] "[O]vercoming qualified immunity is especially difficult in excessive-force cases."[145] To overcome [an officer's] claim of qualified immunity on [a] claim of

---

[142] *United States v. Webster*, 750 F.2d 307, 323 (5th Cir. 1984).
[143] *Turner*, 848 F.3d at 695–96.
[144] *Trammell v. Fruge*, 868 F.3d 332, 339–40 (5th Cir. 2017).
[145] *Morrow v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2019).

excessive force, [a plaintiff] must show (1) an injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable."[146] "[T]he right to make an arrest or an investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."[147]

In reviewing whether the use of force was reasonable, courts must consider the *Graham* factors. A court's review "requires careful attention to the facts and circumstances of each particular case, including" (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight."[148] The "focus is on the officers' reasonable perception of the events at issue, as they happened, *without* the aid of hindsight, multiple viewing angles, slow motion, or the ability to pause, rewind, and zoom."[149] Thus, the overarching question is "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them."[150]

Huddleston alleges that he suffered various injuries stemming from the encounter that Defendants do not contest.[151] They do, however, contest that the injurious use of force was *clearly excessive*.[152]

---

[146] *Terrell v. Allgrunn*, 114 F.4th 428, 437 (5th Cir. 2024) (quoting *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012).
[147] *Graham*, 490 U.S. at 396.
[148] *Id*.
[149] *Terrell*, 114 F.4th at 437–38 (emphasis in original) (quoting *Tucker v. City of Shreveport*, 998 F.3d 165, 176 (5th Cir. 2021).
[150] *Graham*, 490 U.S. at 397 (internal quotation marks and citations omitted).
[151] *See* R. doc. 55 at 44–49.
[152] *See* R. Doc. 42-1 at 30–32; *see also* R. Doc. 44-1 at 42–46.

Officer Constantine argues that the body camera footage shows that Huddleston never once complained about the handcuffs or his arms or shoulder while handcuffed.[153] Moreover, Officer Constantine argues that she did not use just one set of handcuffs, but that she "double-cuffed" Huddleston as an accommodation to prevent any injury.[154] According to Officer Constantine, she took into account Huddleston's age when using two sets of handcuffs, rather than one.[155] The RPSO Defendants contend that only Deputy Fuller assisted in handcuffing Huddleston, and the handcuffing included an accommodation of using two sets of handcuffs instead of one.[156] Further, Deputy Baden and Deputy Cloud did not participate in the handcuffing, but instead, they stood by to provide backup if necessary.[157] Huddleston does not make arguments that the force used was clearly excessive. Instead, he lists out all of his injuries, then leaps to the conclusion that the first two prongs of the inquiry are satisfied.[158]

In the Fifth Circuit, it takes far more than handcuffing to run afoul of the deferential "clearly excessive" standard. *See Pratt v. Harris Cty., Tex.*,[159] (no excessive force where arrestee was hog-tied and died due to asphyxiation); *see also Davila v. United States*,[160] (surrounding car with guns drawn, handcuffing plaintiffs, and forcing plaintiffs to kneel during traffic stop was not excessive or objectively

---

[153] *See* R. Doc. 44-1 at 43.
[154] *See* R. Doc. 44-1 at 43.
[155] *See* R. Doc. 55-3 at 98.
[156] *See* R. Doc. 42-1 at 32.
[157] *See* R. Doc. 42-1 at 32.
[158] *See* R. Doc. 55 at 44–50.
[159] 822 F.3d 174, 184 (5th Cir. 2016).
[160] 713 F.3d 248, 260 (5th Cir. 2013).

unreasonable use of force); *see also Freeman v. Gore*,[161] (no excessive force where "deputies twisted [plaintiff's] arms behind her back while handcuffing her, 'jerked her all over the carport,' and applied the handcuffs too tightly, causing bruises and marks on her wrists and arms"); *see also Glenn v. City of Tyler*,[162] ("handcuffing too tightly, without more, does not amount to excessive force").

The Court finds that double-cuffing Huddleston behind his back was not a "clearly excessive" use of force by Defendants Deputy Fuller and Officer Constantine. As such, Officer Constantine and Deputy Fuller are entitled to qualified immunity as to Huddleston's excessive force claim. Accordingly, Defendants' motions for summary judgment as to Huddleston's excessive force claim is granted.

### d. Sixth Amendment Claims

In his Complaint, Huddleston claims that all Defendants violated his "right to be informed of the nature and cause of the accusation against him secured to Plaintiff under the Sixth and Fourteenth Amendments of the Constitution of the United States."[163] The Sixth Amendment right is applicable to the states through the Due Process Clause of the Fourteenth Amendment."[164]

The United States Supreme Court has "never held that" a police officer is "constitutionally required" to "inform a person of the reason for his arrest at the time he is taken into custody."[165] Under the Sixth Amendment, "the accused shall enjoy

---

[161] 483 F.3d 404, 416 (5th Cir. 2007).
[162] 242 F.3d 307, 314 (5th Cir. 2001).
[163] *See* R. Doc. 1, ¶ IV-1-B.
[164] *In re Oliver*, 333 U.S. 257, 273 (1948).
[165] *Devenpeck v. Alford*, 543 U.S. 146, 155 (2004).

the right to … be informed of the nature and cause of the accusation …."[166] However, "[a] defendant's right to be informed of the nature and cause of an accusation brought against him does not exist until the Government is committed to a prosecution."[167]

"'[C]riminal prosecution[n]' in the Sixth Amendment refers to the commencement of a criminal suit by filing formal charges in a court with jurisdiction to try and punish the defendant."[168] An arrest does not constitute a "criminal prosecution" under the Sixth Amendment.[169] Nor does an investigatory stop constitute a criminal prosecution. Here, because an investigatory stop without more does not constitute a "criminal prosecution" under the Sixth Amendment, Huddleston's right to be informed of the nature and cause of the accusations against him did not yet exist. Accordingly, Defendants' motions for summary judgment as to Huddleston's Sixth Amendment claims are granted, and Huddleston's claims are dismissed.

### e. *Monell Claims*

A municipality may be subject to liability pursuant to § 1983 when the municipality maintains an unconstitutional policy or custom.[170] These claims are sometimes referred to as "*Monell* claims," in reference to the Supreme Court case by that name.[171] In order to state a claim against a municipal defendant for an alleged

---

[166] U.S. CONST. amend. VI.
[167] *Jones v. City of Jackson*, 203 F.3d 875, 880 (5th Cir. 2000).
[168] *Rothgery v. Gillespie Cty., Tex.*, 554 U.S. 191, 223 (2008).
[169] *See id.*; *see also United States v. Gouveia*, 467 U.S. 180, 190 (1984) (observing that the Court has "never held that the right to counsel [under the Sixth Amendment] attaches at the time of arrest.") (modification to original).
[170] *Valle v. City of Houston*, 613 F.3d 536, 541–42 (5th Cir. 2010) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)).
[171] *Monell*, 436 U.S. 658.

unconstitutional policy or practice, the plaintiff must allege that "(1) an official policy (2) promulgated by a policymaker (3) was the moving force behind the violation of a constitutional right."[172] An "official policy or custom" giving rise to liability pursuant to *Monell* may be "a persistent, widespread practice which, although not officially promulgated, is so common and well settled as to constitute a custom that fairly represents municipal policy."[173]

Huddleston seeks to impose *Monell* liability on "Police Chief Ronney Howard, APD, and the City of Alexandria for having a dispatch policy that facilitates the exclusion of information in BOLOs."[174] However, before the Court can address the merits of Huddleston's purported *Monell* claim on summary judgment, Huddleston must have sufficiently pled the claim in his Complaint. To plausibly plead "a practice 'so persistent and widespread as to practically have the force of law,' . . . a plaintiff must do more than describe the incident that gave rise to his injury."[175] "A plaintiff may not infer a policy merely because harm resulted from some interaction with a governmental entity."[176] "The description of a policy or custom and its relationship to the underlying constitutional violation, moreover, cannot be conclusory, it must contain specific facts."[177]

---

[172] *Hicks–Fields v. Harris Cnty.*, 860 F.3d 803, 808 (5th Cir. 2017) (citations omitted).

[173] *Esteves v. Brock*, 106 F.3d 674, 677 (5th Cir. 1997) (quotation omitted).

[174] *See* R. Doc. 55 at 56.

[175] *Peña v. City of Rio Grande City*, 879 F.3d 613, 622 (5th Cir. 2018) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).

[176] *Pudas v. St. Tammany Par.,* No. 18-10052, 2019 WL 2410939, at *3 (E.D. La. June 7, 2019) (alteration in original) (quoting *Colle v. Brazos Cnty.,* 981 F.2d 237, 245 (5th Cir. 1993)).

[177] *Spiller v. City of Texas City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997) (citing *Fraire v. Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992)).

Here, Huddleston's attempt at pleading a *Monell* claim is woefully insufficient. His assertion that the City is liable because "each and all of the alleged acts and/or omissions, conduct, and behavior of Defendants were acting according to a policy or custom of the Alexandria Police Department or Rapides Parish Sheriff's [Office]" is insufficient because it is conclusory and contains no description whatsoever of the policy or custom.[178]

And to the extent that Huddleston seeks to hold the APD, the City, and the RPSO "vicariously liable for all acts and/or omissions of the parties" under § 1983, these claims must also be dismissed. Section 1983 does not create vicarious or respondeat superior liability for the wrongdoing of others.[179]

Accordingly, summary judgment is granted on Huddleston's *Monell* claims.

### f. State Law Claims

Huddleston also asserts state law claims of excessive force, assault, battery, false arrest, false imprisonment, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence against Defendants.[180]

Instead of discussing the merits of his state law claims against Defendants, Huddleston simply argues that Defendants are not entitled to discretionary immunity for his state law claims.[181] However, the Court need not decide whether discretionary immunity applies because Huddleston's claims fail on the merits. As

---

[178] *See id.*

[179] *See Monell*, 436 U.S. at 691–94; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) ("'[S]upervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.").

[180] *See* R. Doc. 1, ¶¶ V 1–11.

[181] *See* R. Doc. 55 at 55–56; *see also* R. Doc. 57 at 59.

such, taking the facts in the light most favorable to Huddleston, Defendants are entitled to judgment as a matter of law, and their motions for summary judgment as to Huddleston's state-law claims are granted.

### i. False Arrest, False Imprisonment, Excessive Force, Assault, and Battery

Louisiana's standard for qualified immunity is identical to the federal standard.[182] Accordingly, Huddleston's state law claims are barred by qualified immunity for substantially the same reasons assigned in dispensing of his federal claims.

Under Louisiana law, "[f]alse arrest and imprisonment occur when one arrests and restrains another against his will without a warrant or other statutory authority. Simply stated, it is restraint without color of legal authority."[183] As discussed above, Huddleston was detained in accordance with the "reasonable suspicion" standard of the Fourth Amendment as described in *Terry*. The Louisiana Supreme Court has held that a "valid investigatory stop" that falls short of an arrest precludes liability for false arrest under Louisiana law.[184] Accordingly, Defendants are entitled to judgment as a matter of law for Huddleston's state law false arrest and false imprisonment claims. Further, since we found neither Officer Constantine nor Deputy Fuller to

---

[182] *See Escort v. Miles*, 2018 WL 3580656, at *8 (W.D. La. July 25, 2018).

[183] *Kyle v. City of New Orleans*, 353 So.2d 969, 971 (La. 1977).

[184] *Harrison v. State Through Dept. of Pub. Safety and Corr.*, 721 So.2d 458, 462–63 (La. 1998); *see also O'Dwyer v. Nelson*, 310 Fed.Appx. 741, 745 n. 4 (5th Cir. 2009) (citing *Harrison* for the proposition that "Fourth Amendment principles underpin Louisiana law relating to false arrests" and discussing federal and state law claims for false arrest in conjunction).

have used excessive force, Huddleston's assault and battery claims fail as a matter of law.[185]

### ii. Negligent and/or Intentional Infliction of Emotional Distress

Huddleston's intentional infliction of emotional distress claims fail to plausibly allege "conduct … so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."[186] Further, Huddleston's fails to allege that the alleged conduct was intended to cause severe emotional distress.[187] Accordingly, summary judgment is granted as to Huddleston's intentional infliction of emotional distress claims.

"Louisiana law does not generally recognize an independent cause of action for negligent infliction of emotional distress.... The cause of action is available under limited circumstances only."[188] The plaintiff must meet the heavy burden of proving outrageous conduct by the defendant.[189] Here, Huddleston has not met that burden. As such, summary judgment is granted as to his negligent infliction of emotional distress claims as well.

---

[185] *See Taylor v. United States,* 1991 WL 280066 (E.D. La. Dec. 19, 1991) ("Under Louisiana law, in the absence of the use of excessive force, a law enforcement officer cannot be held liable for assault and battery if the assault and battery occurred during a lawful arrest.").

[186] *White v. Monsanto Co.*, 585 So. 2d 1205, 1209 (La. 1991).

[187] *See White v. City of Winnfield,* No. 1:19-CV-01410, 2021 WL 2880522, at 11 (W.D. La. Mar. 5, 2021*), report and recommendation adopted,* 2021 WL 2879921 (W.D. La. July 8, 2021).

[188] *DirectTV, Inc. v. Atwood*, 2003 WL 22765354, at *3 (E.D. La. Nov. 19, 2003) (internal quotation marks omitted).

[189] *See Haith v. City of Shreveport*, 2005 WL 2140583, at *6 (W.D. La. Sept. 1, 2005).

### iii.  Negligence

In determining whether to impose liability under Louisiana Civil Code article 2315, Louisiana courts employ a duty-risk analysis, whereby a plaintiff must establish the following five elements:

> (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element).[190]

"A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability."[191]

Huddleston alleges that the Deputies and Officer Constantine failed to "act as a reasonable or prudent police or peace officer would have acted under similar circumstances."[192] The breach factor of the duty/risk analysis considers the reasonableness of the actions taken.[193] Reasonableness is determined by examining the totality of the circumstances.[194] "A court must evaluate the officers[] actions against those of ordinary, prudent, and reasonable men placed in the same position as the officers and with the same knowledge as the officers."[195]

Considering the totality of the circumstances, the Court—having already concluded that the Deputies and Officer Constantine had reasonable suspicion to

---

[190] *Audler v. CBC Innovis Inc.*, 519 F.3d 239, 249 (5th Cir. 2008) (internal citations omitted).
[191] *Mathieu v. Imperial Toy Corp.*, 646 So.2d 318, 321 (La. 1994).
[192] *See* R. Doc. 1, ¶¶ V 1–7.
[193] *Westmoreland v. City of Natchitoches,* 771 So.2d 715, 717 (La. App. 3 Cir. 10/4/00).
[194] *Kyle v. City of New Orleans,* 353 So.2d 969, 973 (La.1977).
[195] *Id*.

detain Huddleston, Deputy Cloud had a reasonable suspicion to initiate the stop, and Deputy Fuller and Officer Constantine used reasonable force in detaining Huddleston—finds that the Deputies and Officer Constantine acted as reasonable officers and did not breach their duty owed to Huddleston. As such, even taking the facts in the light most favorable to Huddleston, Defendants are entitled to summary judgment.

### iv.  Negligent Hiring, Training, Supervision, and Retention

Huddleston alleges that the APD, through Chief Howard, the City, through Mayor Jeffrey Hall, and the RPSO, through Sheriff Wood, were negligent in hiring and maintaining personnel and failed to properly train and supervise its employees.[196] As discussed *supra*, the APD and RPSO are not juridical persons, and thus not capable of being sued.[197] Thus, the negligent hiring, training, supervision, and retention claims can be brought against Chief Howard, the City, and Sheriff Wood.

The Complaint alleges few facts, if any, supporting Huddleston's claims. The Complaint alleges in detail the incidents in July 2021 that include the stop and detention of Huddleston.[198] However, the Complaint does not allege facts explaining how the APD's or RPSO's training programs or any actions by the Deputies or Officer Constantine support Huddleston's claims that they were negligent in hiring, training, supervising, or retaining APD officers or RPSO deputies. The RPSO Defendants have

---

[196] *See* R. Doc. 1, ¶¶ V 8–10.
[197] *See* Part IV.a.
[198] *See* R. Doc. 1, ¶¶ III 1–18.

submitted evidence in the summary judgment record detailing the training received by the Deputies,[199] as did the APD Defendants.[200] In contrast, Huddleston does not point to any evidence relating to the APD's or RPSO's hiring, training, supervision, or retention practices, nor does he address Defendants' arguments that these negligence claims should be dismissed. Accordingly, the Court grants Defendants' motions for summary judgment with respect to Huddleston's negligent hiring, training, supervision, and retention claims.

### v. Vicarious Liability

Finally, Huddleston alleges that the APD, through Chief Howard, the City, through Mayor Jeffrey Hall, and the RPSO, through Sheriff Wood, are "vicariously liable for all acts and/or omissions" under Louisiana law of the Deputies and Officer Constantine.[201] The vicarious liability claims can only be levied against Chief Howard, the City, and Sheriff Wood for reasons discussed *supra*.[202]

The principle of vicarious liability in Louisiana law is codified in article 2320 of the Civil Code, which provides, in pertinent part: "Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."[203] Unlike § 1983 actions, "[m]unicipalities do not enjoy special protection from vicarious liability under Louisiana law and are subject to *respondeat superior* like every other employer."[204]

---

[199] *See* R. Docs. 42-9, 42-10, 42-11, 42-12, & 42-13.
[200] *See* R. Doc. 44-8.
[201] *See* R. Doc. 1, ¶¶ V 8–10.
[202] *See* Part IV.a.
[203] La. Civ. Code art. 2320.
[204] *Deville v. Marcantel*, 567 F.3d 156, 173–74 (5th Cir. 2009) (citing *Brasseaux v. Town of Mamou*, 752 So.2d 815, 820 (La. 2000) ("Although an employment relationship may in fact exist, the employer will

However, because the Court has found no underlying torts on the part of the Deputies and Officer Constantine, Chief Howard, the City, and Sheriff Wood cannot be found vicariously liable.[205] Accordingly, Chief Howard, the City, and Sheriff Wood are entitled to judgment as a matter of law and summary judgment is granted on these claims.

## V.    CONCLUSION

For the reasons set forth herein,

**IT IS ORDERED** that the Defendants' Motions for Summary Judgment (R. Docs. 42, 44) are **GRANTED**.

**IT IS FURTHER ORDERED** that all of Plaintiff's federal and state law claims are hereby **DISMISSED WITH PREJUDICE**.

**THUS DONE AND SIGNED** this 2nd day of February, 2026.

_Jerry Edwards, Jr._
_____
**JERRY EDWARDS, JR.**
**UNITED STATES DISTRICT JUDGE**

---

not be liable for the substandard conduct of the employee unless the latter can be fairly said to be within the course and scope of employment with the former.")).

[205] *Frank v. Parnell*, No. 1:18-CV-00978, 2019 WL 2438685, at *9 (W.D. La. May 14, 2019), *report and recommendation adopted*, 2019 WL 2479462 (W.D. La. June 10, 2019) ("If there is no underlying tort, there can be no basis for the imposition of vicarious liability.").